# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**LEOPOLD GUIDRY,**

       **Petitioner,**

v.

**WARDEN MICHAEL SHEETS,**

       **Respondent.**

**CASE NO. 2:08-cv-1191
JUDGE SMITH
MAGISTRATE JUDGE KEMP**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's Return of Writ, the supplement to that Return, petitioner's Traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## I. PROCEDURAL HISTORY

The procedural history of this case is summarized as follows. The 2004 term of the Washington County, Ohio grand jury indicted petitioner on the charge of causing the death of Falicia Guidry during the course of a felonious assault, in violation of Ohio Revised Code §2903.02(B). Petitioner pleaded not guilty and a jury trial was held. On July 22, 2004, the jury returned a guilty verdict. Prior to sentencing, petitioner filed a motion for a new trial, asserting as grounds that Falicia's mother, Alicia Hanson, had confessed to accidentally killing her daughter. On August 27, 2004, petitioner was sentenced to life in

prison with the possibility of parole after fifteen years. He subsequently filed a second motion for a new trial. After holding a hearing, the Washington County Court of Common Pleas denied the motions in an entry filed on September 27, 2006. *Return of Writ, Exhibits 1-12.*

Petitioner had previously filed a timely notice of appeal, although the appeal was held in abeyance pending a ruling on the motion for a new trial. Once that ruling issued, the appeal proceeded. On appeal, petitioner argued that the trial court erroneously denied his motion for a new trial, erred in instructing the jury by giving erroneous instructions and including irrelevant matters in the jury instructions, and that his conviction was against the manifest weight of the evidence. In an opinion dated August 20, 2007, the Fourth District Court of Appeals overruled his assignments of error and affirmed the conviction. *State v. Guidry*, 2007 WL 2429930 (Washington Co. App. August 20, 2007). Petitioner timely appealed that decision to the Ohio Supreme Court, again raising the first two issues which he had argued before the court of appeals. *Return of Writ, Exhibit 26.* On December 26, 2007, the Ohio Supreme Court denied review. *State v. Guidry*, 116 Ohio St. 3d 1458 (2007).

On December 23, 2008, petitioner, through counsel, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following ground:

**GROUND ONE:** Petitioner's right to due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, was violated when the trial court failed to grant Petitioner's motion for a new trial after the prosecution's key witness recanted her testimony implicating Petitioner Guidry.

*See Petition.* It is respondent's position that this claim is without merit.

## II. THE FACTS

The facts of this case were summarized in *State v. Guidry, supra,* in this way:

> Falicia Guidry was born on September 11, 2003, to Alicia Hanson and the Appellant. The three resided together, along with Ms. Hanson's three-year old daughter, Ashley. Ms. Hanson testified at trial that she went to bed sick between 8:00 and 8:30 p.m. on the evening of November 25, 2003. At approximately 9:30 p.m., the Appellant woke her up to tell her there was something wrong with Falicia. The Appellant told Ms. Hanson that Falicia had vomited and stopped breathing. At that point, Ms. Hanson attempted CPR on Falicia and then called the emergency squad, which attempted artificial respiration and transported her to Marietta Memorial Hospital. During the time the squad members attempted artificial respiration on the child, she had no pulse or spontaneous respiration. She was later transported to Children's Hospital in Columbus. She died two days later.
>
> Dr. Collie Trant, a forensic pathologist who performed an autopsy on Falicia, testified that she died because she had sustained blunt force trauma to her head, which caused irreversible swelling. He also testified that he found old injuries to Falicia, specifically broken ribs and another injury to her head. Dr. Philip Scribano, Falicia's treating physician at Children's Hospital, also testified that Falicia had suffered impact to her head that caused severe damage to her brain stem. He testified that the damage to her brain stem in turn caused her to experience heart and lung arrest. He also testified that the injuries Falicia sustained would have caused the damage to her brain stem and heart and lung arrest immediately or within moments after impact.

Detective Mark Warden interviewed the Appellant at Children's Hospital prior to Falicia's death. He told Detective Warden and the doctors that he fed Falicia, burped her, and that she had fallen asleep, so he laid her on the couch. He said he had gone to the bathroom, and when he returned, Falicia was in distress. While Detective Warden was speaking with the Appellant and Ms. Hanson, Dr. Scribano asked if there was some other way they could explain Falicia's head injury. At this point, the Appellant said that the family had been staying at a friend's house when Falicia was first born, and that someone could have stepped on her while she was sleeping on the floor there.

Detective Warden subsequently interviewed Ms. Hanson separately. She told him that on an earlier occasion, when she was trying to sleep and the baby was crying, she had shaken the baby and then punched her in the head. Ms. Hanson also testified to this set of facts, but then recanted her statement on cross examination.

After Falicia died, Children's Services employee Jim McKenna interviewed the Appellant. When Mr. McKenna asked how the Appellant thought Falicia had sustained the injuries, the Appellant noted that he had seen Ms. Hanson's other daughter, Ashley, bouncing on the bed and that she had fallen on Falicia. He also recalled that another child in the home had "possibly dropped" a toy truck on Falicia. The Appellant told Mr. McKenna that Ms. Hanson didn't know about these events despite the fact that he really wanted to tell her, because he forgot to relate them to her. He went on to say, "I forget really important things all the time."

The Appellant also discussed the possibility of taking a polygraph test with Mr. McKenna. He noted his concern about polygraphs, stating "[y]ou can ask me the same question five times, and I can tell you the god-honest truth and probably one or two of those times, it'd say I'm lying." He likewise noted, "I mean, I'll take [a polygraph test], to see if it comes out, see how the results come out, but if it's saying I'm lying about something that I'm telling the truth about, then that's bull----[.]" During the interview, the Appellant also told Mr.

4

McKenna that he had been in counseling for what he believed was anger management.

Later in the interview, Detectives Warden and Schuck began questioning the Appellant about his prior comments suggesting someone had stepped on Falicia. When the detectives began this line of questioning, the Appellant stated, "[y]eah, but there's a whole list of things I think may have happened." He then began explaining a number of scenarios he thought may have been the source of Falicia's life-ending injury. Throughout each of these explanations, the Appellant consistently noted that Ms. Hanson was in bed when Falicia became ill. He also claimed memory loss or distortion periodically throughout his explanations.

At one point while explaining these scenarios, the Appellant claimed that Falicia sustained an injury to her head on November 25 while Ms. Hanson was holding her. He also described for the detectives another incident in which he thought Ms. Hanson had been too rough with Falicia, tossing her onto the couch. He also told Detective Warden that Ms. Hanson had struck him previously.

At that time, Detective Schuck apprised the Appellant that other officers were simultaneously interviewing Ms. Hanson, and that she denied dropping Falicia. The Appellant answered, "Well, she's sticking to what she said. Well, let her go down herself, then." Shortly thereafter, he reiterated his concerns about his memory, stating, "[t]here's certain things that happened in the past, that I might think happened yesterday." Later he stated "[m]aybe it wasn't [inaudible] that that happened. Maybe it was something that I seen in television that I may have possibly * * *[.]" Shortly thereafter, he said, "Maybe it was something in the past that maybe didn't happen that time, but it happened a long time ago, maybe it was my mom or something."

As Detectives Warden and Schuck continued their conversation with him, the Appellant again reverted to suggesting that Ms. Hanson had caused Falicia's injury. When Detective Warden asked the Appellant to tell him and

5

Detective Schuck exactly what happened, the Appellant replied, "Now with the way that-well, Alicia's mom's background is? It's a possibility that she did what she told you. She never admitted it to me."

The Appellant then advanced two different possibilities for the source of Falicia's injury. He stated that Ms. Hanson's three year old daughter Ashley had pulled Falicia away from him at one point, causing her to fall on her head. Next, he stated that he had tossed Falicia into the air and then dropped her, causing her to fall on her head. He also commented at the end of his interview with Detectives Warden and Schuck that he was angry with Ms. Hanson for lying and although he said that Ms. Hanson had not hit the baby, he wasn't sure about whether she had caused Falicia's rib injury. He also indicated concern that Ms. Hanson would find out what he had told the detectives.

The next interview took place on December 24, 2003. Detectives Warden and Johnson interviewed the Appellant. During this interview, the Appellant again stated that Ms. Hanson was asleep when Falicia went into physical distress. He also stated that he couldn't remember exactly what he had previously told detectives about the circumstances surrounding Falicia's death. He hinted that Ms. Hanson may have done something to Falicia while he was gone. He also suggested that the fact that he dropped Falicia may have exacerbated an injury Ms. Hanson had caused Falicia earlier. He noted, "I don't believe she could have hit our daughter, but there's always your point of view. There's a possibility that within that time that I was gone that she did something possibly and didn't tell me about it, and then when I came back and I dropped the child * * *[.]"

Detectives Warden and Johnson stressed that the medical professionals that examined Falicia indicated her death was caused by blunt force trauma to the head, but that it couldn't have been caused by him dropping her. At this point, the Appellant suggested that someone had punched Falicia. Later in the interview, Detective Warden asked the Appellant if it was possible that he struck Falicia. Appellant said, "Well

> maybe the reason why I can't recall it is because there's a possibility that I did do it and didn't realize it." He also said later, "I don't know if I struck her. I can't say that I did because I can't remember if I did or not."
>
> Ultimately, the Appellant confessed that he hit Falicia as she lied on the couch next to him because she was crying when he was trying to hear a particular part of the movie he was watching.

*State v. Guidry*, 2007 WL 2429930, *1-3.

### III.  STANDARD OF REVIEW

Petitioner presented his claim that he was entitled to a new trial to the state courts, and those courts issued rulings on the merits. Generally, this Court reviews such rulings under the deferential standard found in the Antiterrorism and Effective Death Penalty Act of 1995. That standard is explained as follows.

A federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States District Court for the Western District of Michigan has summarized this standard as follows:

> [A] decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." [*Williams v. Taylor*, 529 U.S. 362 (2000)] at 413. A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. A federal habeas court may not find a state court's adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. Further, the federal habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id*.

*Williams v. Lavigne*, 2006 WL 2524220 (W.D. Michigan August 30, 2006).

## IV. CLAIM ONE

### A. The Nature of the Due Process Claim.

In his first and only claim, petitioner asserts that he was denied due process of law because the state court did not grant his motion for a new trial. He portrays his girlfriend (and Falicia's mother), Alicia Hanson, as the "key witness" against him at trial based on her testimony that she was sleeping at the time Falicia was struck and killed. Because

8

petitioner was the only other adult present in the home, her testimony strongly implicated him. After trial, however, Ms. Hanson stated on several occasions that she struck the baby on the head and that she, and not petitioner, was responsible for Falicia's death. She also wrote a letter to petitioner's attorney to that effect and admitted her guilt to a jail inmate named Kinney. On this basis, petitioner requested a new trial.

The hearing on the motion was conducted in two parts. Ms. Hanson testified briefly at the first hearing, but invoked her Fifth Amendment right against self-incrimination at the second. She had been granted use immunity for her testimony, and was ordered to testify, but still refused, leading to her being held in contempt. The trial court subsequently denied the motion for a new trial, finding that Ms. Hanson's attempted or purported admissions of guilt were not credible. Petitioner claims that this finding was an abuse of discretion and was "unreasonable, arbitrary, and unconscionable." *Petition, Doc. #1, at 19.*

The habeas petition itself does not make a particularized argument under the federal due process clause. However, in his traverse, petitioner expands upon the due process theory underlying his claim by asserting that he did not receive due process of law because his conviction was based on false testimony. He further asserts that the denial of his motion for a new trial, allowing his conviction based on false testimony to stand, is a violation of his rights. He asks that a conditional writ be granted ordering the state to provide him with a new trial where the jury can evaluate Ms. Hanson's credibility in light of the totality of the evidence, including her numerous post-trial admissions of guilt.

### B. The State Court Rulings.

Petitioner's first motion for a new trial was filed under Ohio Criminal Rules 33(A)(6) and (B). It relied on Ohio case law, specifically *State v. Petro*, 148 Ohio St. 505 (1947), for the substantive legal test of when a new trial should be granted. It cited no federal case law, statute, or constitutional provision, and made no argument that failure to grant the motion would violate Fourteenth Amendment's Due Process Clause. *Return of Writ, Exhibit 2.* Petitioner's second motion for a new trial did not cite any additional legal authority, but instead provided an additional evidentiary basis for the motion, namely Ms. Hanson's statement to inmate Kinney. *Return of Writ, Exhibit 5.* The brief filed with the trial court (*Return of Writ, Exhibit 9*), likewise was silent on any federal aspect of the claim, identifying the sole issue as "whether or not Mr. Guidry should receive a new trial in light of all the newly discovered evidence pursuant to Criminal rule 33(A)(6) and Ohio Revised Code Section 2945.79(F)." *Id.* at 4.

In its ruling on the motion, the Washington County Court of Common Pleas held as follows:

> The Court, in making a determination as to whether or not to grant a motion for a new trial on the basis that a witness has recanted trial testimony, must determine whether the statements of the recanting witness are credible and true; and if the statements are to be believed, whether they would materially affect the outcome of the trial.

> The Court finds that the recanted testimony of Alicia Hanson is not credible as presented in the letter to the Defendant's first attorney nor as indicated in the unsworn statement as a cell mate. No affidavit is presented. The context in which the letter was written and sent to the Defendant's first attorney is fraught with pressure from the Defendant, assurances that there would be no negative ramifications, a promise that the letter would reunite

the family, specific dictation by the Defendant as to what to write, and constant equivocation by the witness as well as other indications that the recantation is not reliable. The statement to the cell mate is also equivocal.

The Court denies the motion for new trial.

*Return of Writ, Exhibit 11.*

On appeal, petitioner asserted in his first assignment of error that the ruling denying his motion for a new trial violated the federal constitution, particularly the right to due process as guaranteed by the Fifth and Fourteenth Amendments. In his argument supporting that assignment of error, however, he claimed that the ruling was an abuse of discretion because the trial court should have found the recantation to have been at least as credible as Ms. Hanson's trial testimony, and that to find otherwise was unreasonable, arbitrary and unconscionable. The opening appellate brief cites no federal case law but relies wholly on Ohio law as providing the basis for granting a motion for a new trial. *Return of Writ, Exhibit 15.* However, in his reply brief, petitioner did cite a federal case, *Napue v. Illinois*, 360 U.S. 264 (1959), for the proposition that if it is established that a criminal conviction is based on false testimony, it violates due process to allow the conviction to stand. *Return of Writ, Exhibit 23, at 3.*

The Fourth District Court of Appeals disposed of petitioner's assignment of error concerning the trial court's failure to grant him a new trial as follows:

> In his first assignment of error, the Appellant argues that the trial court erred when it denied his motion for a new trial. The decision whether to grant or deny a motion for new trial on the basis of newly discovered evidence is committed to the sound discretion of the trial court. *State v. Williams* (1975),

43 Ohio St.2d 88, 330 N.E.2d 891, paragraph two of the syllabus. *See, also, State v. Matthews* (1998), 81 Ohio St.3d 375, 691 N.E .2d 1041, citing *State v. Schiebel* (1990), 55 Ohio St.3d 71, 564 N.E.2d 54, paragraph one of the syllabus. We will not reverse a trial court's denial of a motion for new trial absent an abuse of that discretion. *State v. Hawkins* (1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227; *Williams* at paragraph two of the syllabus. An abuse of discretion is more than a mere error in judgment; it implies that a court's ruling is unreasonable, arbitrary, or unconscionable. *Richard v. Seidner* (1996), 76 Ohio St.3d 149, 666 N.E.2d 1134; *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

A convicted offender seeking a new trial based on the grounds of newly discovered evidence bears the burden of demonstrating to the trial court that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro* (1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus; *Hawkins* at 350.

Given the evidence upon which the Appellant relies, it was not an abuse of discretion for the trial court to deny the Appellant's motion for a new trial. The Appellant relied upon recanted testimony given by his fiancé, Ms. Hanson, that he asked her to provide so that he could escape his sentence. The Appellant went so far as to craft the confession that Ms. Hanson sent to Janet McKim.

Newly discovered evidence which purportedly recants testimony given at trial is "looked upon with the utmost suspicion." *State v. Wilburn* (Dec. 22, 1999), Lawrence App. No. 98CA47, 1999 WL 1281507. When a motion for a new trial based on the recantation of trial testimony is brought in the trial court, the court must determine which of the contradictory testimonies of the recanting witness is credible and true and would the recanted testimony have materially affected the outcome of the trial. *State v. Pirman* (1994), 94 Ohio App.3d 203, 209, 640 N.E.2d 575. Based on the various statements made by Ms. Hanson and the Appellant, it was not an abuse of discretion for the trial court to find that her confession, as set forth in her letter to Janet McKim, was not credible or true. In light of the lack of credibility of the newly discovered evidence advanced by the Appellant, there is no probability that the new evidence would change the outcome of the case if a new trial was

granted. Thus, the Appellant did not meet his burden under the first prong of *Petro, supra.* Accordingly, his first assignment of error is overruled.

*State v. Guidry*, 2007 WL 2429930, *6.

In his petition for review by the Ohio Supreme Court, petitioner again cited to the Fifth and Fourteenth Amendments in his first proposition of law. *Return of Writ, Exhibit 25.* The Ohio Supreme Court denied the appeal as not involving any substantial constitutional question. *Return of Writ, Exhibit 27.*

### C. Is Petitioner's Due Process Claim Reviewable?

In the Return, respondent first argues that the due process claim petitioner advances here is, in actuality, an assertion that he was denied due process during the course of state post-conviction proceedings. Citing to *Kirby v. Dutton*, 794 F.2d 245 (6th Cir. 1986), respondent asserts that challenges to post-conviction proceedings cannot be raised in a federal habeas corpus petition because the writ can be granted only if some constitutional infirmity infected the trial itself. Petitioner counters that in his motion for a new trial, he established that his conviction was based on false testimony, so that he is not attacking the fairness of any post-conviction proceeding but the fairness of the trial process.

In *Kirby v. Dutton*, the petitioner asserted that he had been deprived of the effective assistance of counsel in state post-conviction proceedings. The district court dismissed that claim because there is no constitutional right to counsel in such proceedings. On appeal, the petitioner argued that his real claim was a violation of due process and equal protection

based on the state court's having forced him to continue to pursue post-conviction relief with an attorney whom he wished to replace. The Court of Appeals did not reach the merits of any of petitioner's claims because it ruled that federal habeas corpus relief is simply unavailable to a petitioner whose claims are directed exclusively at the way in which post-conviction proceedings are conducted. *Id.* at 247.

Here, petitioner is not alleging any procedural constitutional defects in the way in which the proceedings on his motion for a new trial were conducted. Rather, as he points out, his issue does relate to the state court's refusal to overturn his conviction in the face of what he apparently believes to be conclusive testimony that Ms. Hanson testified falsely at the trial. The general rule that "federal habeas relief is not available to redress alleged procedural error in state post-conviction proceedings," *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998), would appear to be inapplicable here because petitioner is not claiming a procedural error. In fact, this Court has entertained due process challenges in the context of new trial motions in other cases. *See, e.g., Austin v. Mack*, 2005 WL 1652533 (S.D. Ohio July 11, 2005). Therefore, the Court concludes that the due process claim raised by petitioner is cognizable in habeas corpus.

### D. What is the Standard of Review?

As noted above, although petitioner relied primarily on state law principles in arguing both that his motion for a new trial should have been granted, and that the trial court's refusal to do so was error, he did, from time to time, cite to both provisions of the United States Constitution and to federal case law in support of his claims. The last

14

reasoned state court decision, from the Fourth District Court of Appeals, did not analyze the federal constitutional issue. That is the decision this Court must review. *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).

Because the Ohio Court of Appeals did not explicitly address petitioner's due process claim, the Court must consider the applicable standard of review. Under these circumstances,

> [t]here are three options: the deferential standard provided under § 2254(d); the de novo standard, and the "intermediate approach." *See Maples v. Stegall,* 340 F.3d 433, 436 (6th Cir.2003) (de novo); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir.2000), cert. denied, 532 U.S. 947, 121 S.Ct. 1415, 149 L.Ed.2d 356 (2001) (discussing alternate standards); *McKenzie v. Smith*, 326 F.3d 721, 726-27 (6th Cir.2003), cert. denied, 540 U.S. 1158, 124 S.Ct. 1145, 157 L.Ed.2d 1057 (2004) (same); *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir.2005) (same). The gist of circuit precedent is that when there is a decision, deference is accorded under § 2254(d) to the state court decision under the "intermediate approach." *Moldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir.2005); *Howard,* 405 F.3d at 467. When there is no decision or "no results," federal review is de novo. *See Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (de novo when there was no state court decision on second prong of *Strickland* test). When the state court has failed to articulate a decision or provide a rationale, the district court must distinguish between a situation of "no results" from that of "no reasoning". *Howard v. Bouchard*, 405 F.3d at 467; *McKenzie*, 326 F.3d at 727.... [T]he "no reasoning" situation occurs when the state court has issued a summary order, which fails to explain its reasoning, as opposed to the situation where no state court has "directly addressed the specific issue." In the latter situation there are "no results" for the federal court to defer, and de novo review by the federal court is required. *See Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *McKenzie*, 326 F.3d at 327.

*Socha v. Wilson*, 477 F.Supp.2d 809, 819 (N.D.Ohio February 21, 2007). Thus, it appears that either a de novo or "intermediate approach" is required here. *Id*. Regardless, however, of the standard of review that is applied, the Court concludes that petitioner's claim is without

merit.

## E. The Due Process Claim.

The nature of petitioner's due process claim, as explained above, is that the state court acted unreasonably and arbitrarily by refusing to find that Ms. Hanson's post-trial recantation of her testimony, and her confession to having been the one who administered the fatal blow to Falicia, were at least as credible as her trial testimony. This refusal, in turn, led to the refusal to grant a new trial to someone who, according to petitioner, was convicted on the basis of false testimony. But to let a conviction based on false testimony stand is, claims petitioner, a violation of federal due process. For the following reasons, the Court concludes that this claim is without merit.

Although couched as a legal claim, what petitioner really argues is that the state trial court erred in finding, as a matter of fact, that Alicia Hanson's post-trial "confessions" were not credible enough to warrant granting petitioner a new trial. This claim is foreclosed by 28 U.S.C. §2254(e)(1). That provision states, in relevant part, that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." The petitioner has the burden of overcoming this presumption of correctness by clear and convincing evidence. *Id.; see also Matthews v. Ishee*, 486 F.3d 883, 892 (6th Cir. 2007) (federal courts "must accept [a state court] finding of fact unless it is rebutted by clear and convincing evidence").

Here, the state court held, for various reasons, that it did not give much credence to

Ms. Hanson's post-trial statements. It noted that her letter to petitioner's attorney was essentially dictated by petitioner and was the result of many telephone calls from him to her. Further, based on those conversations, Ms. Hanson may have been convinced that by taking responsibility for the crime, she would not be prosecuted, and she could be reunited with petitioner and her other child. Finally, her "confession" to inmate Kinney was not made under oath and was, in the state court's words, "equivocal." Petitioner has not presented any new evidence to this Court which would meet the "clear and convincing" standard needed to overturn the factual findings of the state court. If, as this Court must conclude, the state court's factual finding on the issue of Ms. Hanson' credibility is correct, the Court cannot conclude that petitioner was convicted on the basis of false testimony, and his due process claim collapses.

Even if the state courts' conclusion on the factual basis of petitioner's claim were not completely dispositive, this Court could not grant relief. As the Court explained in *Austin v. Mack*, *supra*, this Court may not review the Ohio courts' refusal to grant a new trial on state law grounds because such claims cannot be heard in federal habeas proceedings. Thus, the Court may not conduct a review of any kind of petitioner's claim that the Ohio courts erred in the way in which the factors set forth in Ohio Crim. R. 33(A)(6) were applied.

As to petitioner's federal law claim, the Court notes, first, that post-trial recantations of trial testimony are not uncommon. Courts generally, and correctly, view them with suspicion. Thus, "[m]otions for a new trial based on newly-discovered evidence are

disfavored and should be granted with caution" even in the context of a motion directed to a federal trial court in which a federal conviction has occurred. *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000). When such a motion has been made in a state court and is under due process review in a federal habeas court, the standard for finding a due process violation is even more demanding. To the extent that the denial of a new trial implicates federal due process concerns, it does so only when there has been "'a denial of fundamental fairness or the denial of a specific constitutional right ....'" *Id.* at *8, quoting *United States ex rel. Guillen v. DeRobertis*, 580 F.Supp. 1551, 1556 (N.D. Ill. 1984). Further, this Court held in *Austin* that "the mere existence of newly discovered evidence relevant to the guilt of the defendant does not implicate constitutional concerns, and thus does not constitute a ground for federal habeas corpus relief, absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id*; *see also Wright v. Stegall*, 247 Fed.Appx. 709, *3 (6th Cir. 2007) "the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death penalty context ..."). Even if that were not the case, any new evidence of the petitioner's innocence would have to be "'so compelling' that it would violated the fundamental fairness embodied in the Due Process clause not to afford the petitioner a new trial where the new evidence could be considered." *Monroe v. Smith*, 197 F.Supp. 2d 753, 763, quoting *White v. Keane*, 51 F.Supp. 2d 495, 502-03 (S.D.N.Y. 1995).

This is simply not such a case. The Court adheres to its holding in *Austin* that the essence of petitioner's claim here, that he is actually innocent of the crime for which he has

18

been convicted, does not provide the basis for habeas corpus relief because he has not pointed to any specific constitutional error that occurred at his trial. Further, the evidence of his innocence does not meet the "compelling" standard. Ms. Hanson's testimony was not the only basis for petitioner's conviction. He confessed to striking Falicia on the head immediately before she stopped breathing. In his confession, and his many statements to police, he corroborated Ms. Hanson's testimony that he was the adult who was supervising and was with Falicia when she began to experience distress. The medical testimony showed that, based on the nature of the injury which Falicia sustained, distress followed by death would have occurred almost immediately after she was struck. Thus, any case for petitioner's innocence is simply less than compelling. For these reasons, he is not entitled to any relief in this Court.

## V. RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## VI. PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court

may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge